## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 15 2016, 8:49 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Kristin A. Mulholland
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Katherine Modesitt Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Takesha Lashawn Sanders,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 15, 2016

Court of Appeals Case No.
45A04-1506-CR-648

Appeal from the
Lake Superior Court

The Honorable
Samuel L. Cappas, Judge

Trial Court Cause No.
45G04-1301-FA-1

**Kirsch, Judge.**

[1] Takesha Lashawn Sanders ("Sanders") was found guilty but mentally ill of murder[1] after a jury trial. She appeals, raising the following restated issue for our review: whether the trial court abused its discretion when it refused to instruct the jury on the lesser included offense of reckless homicide.

[2] We affirm.

## Facts and Procedural History

[3] In January 2013, Sanders was living with Gregory Cole ("Cole"), their son, and Sanders's son from another relationship in a residence on Tennessee Street in Gary, Indiana. Cole's friend, Charles Hampton ("Hampton"), was also living in the residence. At approximately 5:00 p.m. on January 8, 2013, Cole and Sanders began drinking and continued to drink throughout the night. Hampton came home around 6:00 or 7:00 p.m. and saw that Sanders and Cole had been drinking. Hampton had also been drinking and continued to do so in his bedroom after returning to the residence. Sanders's sister, Sharese Burks ("Burks"), also arrived at the residence sometime after Hampton and mostly stayed in the bedroom with the children.

[4] Although Hampton stayed in his bedroom most of the night with the door closed, he did observe several arguments between Sanders and Cole. When he first witnessed the two arguing, it was not a physical argument, but the second

---

[1] *See* Ind. Code § 35-42-1-1(1).

time he observed them fighting, Sanders was pushing Cole, who appeared drunk and was having trouble standing. The third time Hampton opened his bedroom door and saw Sanders and Cole arguing, "[Sanders] was pushing [Cole] around, getting basically the best of him this time." *Tr.* at 83. Hampton attempted to intervene, but Cole told him to stay out of it, so Hampton returned to his bedroom, had another drink, and went to sleep.

[5]     Burks also witnessed Sanders and Cole arguing that night. Burks stayed in the bedroom most of the night, but came out periodically. One of the times Burks came out, she saw Cole with a knife in his hand. Later when Burks opened the bedroom door to check on Sanders and Cole, she saw blood and Cole's body on the floor. Burks called Melinda Harvey ("Harvey"), a family friend, a couple of times between 12:30 and 2:00 a.m. on January 9 to tell Harvey that Sanders and Cole were fighting and that Burks needed to check on Sanders.

[6]     According to Sanders, she and Cole had several arguments that night. At a certain point, Cole began to yell at her while they were in the kitchen, but she could not recall what the argument was about. She saw Cole grab something that she thought was a knife and heard him say something about "those mother f*cking kids," which scared her. *Id.* at 501. Cole began walking into the living room area, and Sanders tried to stop him from getting to the children. She cut off his path and told him to give her the knife. Cole refused and told Sanders to get out of his way. Sanders did not remember anything after that.

[7] Burks again called Harvey at 4:00 a.m. and told her that they needed help. Burks said, "[Y]ou got to help, it's bad, it's bad. Come help us. Come get us." *Id.* at 209. Sanders left the home with Burks and the children, and they arrived at Harvey's home around 4:30 a.m. Harvey noticed that Sanders's face was red and that Sanders had cuts on her hands. Harvey also observed that Sanders appeared to be in shock. Burks called her and Sanders's older brother, who told Burks to contact the police. However, the brother ended up contacting the police.

[8] Gary Police Department Officer Justin Hedrick ("Officer Hedrick") responded to a welfare check at Cole's address and found Cole lying on his stomach in a pool of blood. The responding officers checked Cole for a pulse and found none. Officer Hedrick continued to clear the rest of the residence and discovered Hampton asleep in his room. Hampton identified Cole to Officer Hedrick. Two knives were collected from Cole's residence: a black-handled folding knife recovered next to Cole's body and another folding knife with a brown handle that was located in a drawer under some paperwork. The black-handled knife tested positive for blood, but the other knife did not. It was later determined that Cole suffered five stab wounds to his upper body, three of which were flesh wounds to the skin and muscle, one which lacerated his liver and caused internal hemorrhaging, and one which penetrated the heart from front to back and caused substantial blood loss. The wound to the heart was most likely the wound that killed Cole.

Gary Police Department Officer Nicholas Ferrell was dispatched to Harvey's address to transport Sanders to the police department as the suspect in Cole's death. Sanders's hands were bandaged by paramedics, and she was taken to the Gary Police Department, where she met with Detective Michael Barnes ("Detective Barnes"). Detective Barnes advised Sanders of her Miranda rights, and she signed a waiver of rights form. Detective Barnes then conducted a video-taped interview with Sanders, in which she admitted to stabbing Cole.

Sometime after Cole's death, his aunt, Sandra Cole ("Sandra"), went to Cole's home to clean and found journals, consisting of a small journal and a composition notebook, kept by Sanders. Sandra gave the journals to the police. A handwriting expert determined that Sanders wrote the passages contained in the small journal and that it was highly probable that Sanders wrote the passages contained in the composition notebook. In a passage from the small journal dated January 8, 2013, which was the day before she killed Cole, Sanders wrote:

> Man, I can't wait to get the hell out of here because [Cole] really lost his mind. I honestly wanted him dead on Sunday. This n***a was on other sh*t. This b*itch saying all types of sh*t and got mad when I said some sh*t, like he the only one who could say something. If [Hampton] wasn't here I probably would have stab[b]ed that n***a, but I don't know if he pissed me off bad enough. If he kept talking or tried to put his hands on me then it would have been over for him and since I don't believe in God I would not feel too bad about it. I would have been scared I would get caught and sad for his family but as time pass[ed] I would get over it.

*State's Ex.* 124; *Tr.* at 426-27.

[11]   The State originally charged Sanders with Class A felony voluntary manslaughter and Class B felony voluntary manslaughter, but later amended the charges to include murder. Prior to the trial, the State dismissed the voluntary manslaughter charges. Sanders raised a defense of insanity, and the trial court appointed Dr. Douglas Caruana ("Dr. Caruana"), a psychologist, and Dr. Bhawani Prasad ("Dr. Prasad"), a psychiatrist, to evaluate Sanders. Both doctors testified at trial. Dr. Caruana determined that Sanders did not meet the criteria for insanity as defined by the statute. *Tr.* at 720. Dr. Prasad concluded that Sanders was sane at the time she killed Cole. *Id.* at 759.

[12]   At trial, Sanders testified that Cole had a knife and made threatening statements about the children and that she believed she had to stop him. *Id.* at 501-02. Sanders testified that she did not remember stabbing Cole or giving a statement to Detective Barnes. *Id.* at 503-05. In her testimony at trial, Sanders stated that she had been the victim of sexual and physical abuse beginning in the second grade. She related that she developed what she referred to as "best friend," who she first met at around age eight. *Id.* at 496. When Sanders was young, "best friend" was comforting and supportive, but as she grew older, he would "say bad things" and call her names. *Id.* at 497, 499. Sanders testified that "best friend" was in the kitchen the night she killed Cole and told Sanders that she "had to stop [Cole] before he hurt [her] kids." *Id.* at 502.

[13] On cross-examination, Sanders admitted that she had told Detective Barnes during her interview that she liked knives and that she had picked up the black knife and put it in her pocket the night she killed Cole. *Id*. at 523-24. Sanders told Detective Barnes that Cole had a brown-handled knife. *Id*. at 524. On cross, Sanders acknowledged that she had told the 911 operator that Cole had attacked her with a knife and she had to stab him because her life was in danger. *Id*. at 529-30. Sanders also agreed that she told Detective Barnes that "[Cole] was making her mad, [and she] had a knife so [she] stabbed him." *Id*. at 530.

[14] During the trial, Sanders presented expert testimony from Dr. Karla Fisher ("Dr. Fisher"), a psychologist and lawyer, who had interviewed Sanders. Dr. Fisher testified about battered woman syndrome and concluded that Sanders was a battered woman, that the abuse was significant, and that she suffered from post-traumatic stress disorder. *Id*. at 612-13. Dr. Fisher concluded that "[Sanders] struggled with [Cole] over the knife because she thought he was gonna [sic] kill her children and in that struggle or after that struggle she killed him because she thought he was still serious about killing them." *Id*. at 615. Dr. Fisher found out about "best friend" from interviewing Sanders and referred her to Dr. Lisa Rone ("Dr. Rone"), a clinical psychologist. Dr. Rone diagnosed Sanders with dissociative identity disorder, not otherwise specified. Dr. Rone stated that "best friend" was "real in the sense that his persona is a part of . . . Sanders and she experiences this persona as a separate and unique identity, separate from her." *Id*. at 681. Dr. Rone concluded that Sanders's act

of killing Cole "was not a willful act, this was an automatic act and an act in which she did not appreciate the wrongfulness of her conduct." *Id*. at 688.

[15] At the close of evidence, defense counsel requested that the trial court instruct the jury on voluntary manslaughter and reckless homicide. At that time, the trial court stated that it would give an instruction on the lesser included offense of voluntary manslaughter, but not on reckless homicide. Defense counsel subsequently requested the trial court to give the jury the pattern jury instruction for reckless homicide. The trial court questioned what facts supported the giving of such an instruction, stating, "Your client testified she didn't have any memory of the event. How do you get a Reckless from that?" *Id*. at 812. Defense counsel responded, in pertinent part:

> You understand with the mental state being the thing in question, we don't know. Maybe they could maybe reduce it from stab wound patterns, from the pathology diagram. They might be able to do it between how they are going to reconstruct the testimony of . . . Hampton and . . . Burks, the two other people who witnessed a position of the argument that night.
>
> There's a myriad of ways I think that this could be achieved. I just believe that it would be appropriate. I believe it would be a simple one to add in. And I think it would be a fundamental fairness to [Sanders].

*Id*. at 813. The State again opposed giving the instruction on reckless homicide, and the trial court ultimately refused to give the jury an instruction on reckless homicide, finding that there was no serious evidentiary dispute as to the facts of the case. The trial court continued, "The victim had one stab wound directly to

the heart, penetrated all the way through. . . . I don't find this to be a reckless fact pattern such that a lesser included offense is warranted." *Id*. at 817. At the conclusion of the jury trial, the jury found Sanders guilty but mentally ill as to the murder. The trial court sentenced Sanders to forty-seven years and ordered the Department of Correction to evaluate her mental capacity. Sanders now appeals.

## Discussion and Decision

[16] Sanders argues that the trial court abused its discretion when it refused to instruct the jury as to reckless homicide. The trial court has broad discretion in instructing the jury, and we generally review its instructional determinations only for an abuse of discretion. *Jackson v. State*, 33 N.E.3d 1067, 1071 (Ind. Ct. App. 2015), *trans. denied*.

[17] Our Supreme Court in *Wright v. State*, 658 N.E.2d 563 (Ind. 1995), set out a three-part test that trial courts should perform when requested by a party to instruct on a lesser included offense to the crime charged. *Webb v. State*, 963 N.E.2d 1103, 1106 (Ind. 2012). First, the trial court must compare the statute defining the crime charged with the statute defining the alleged lesser included offense to determine if the alleged lesser included offense is inherently included in the crime charged. *Id.* Second, if it is determined that an alleged lesser included offense is not inherently included in the crime charged under step one, then the trial court must determine if the alleged lesser included offense is factually included in the crime charged. *Id.* If the alleged lesser included

offense is neither inherently nor factually included in the crime charged, the trial court should not give an instruction on the alleged lesser included offense. *Id.* Third, if it has determined that an alleged lesser included offense is either inherently or factually included in the crime charged, the trial court must then look at the evidence presented in the case by both parties to determine "if there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater." *Id.* If such an evidentiary dispute exists, it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense. *Id.*

[18] Sanders argues that the trial court abused its discretion and committed reversible error when it refused to give the jury an instruction on reckless homicide. She contends that reckless homicide is an inherently included lesser offense of murder and that a serious evidentiary dispute existed concerning Sanders's state of mind at the time of the crime, which created an issue for the jury as to which offense she may have committed. Sanders asserts that there was a serious evidentiary dispute as to what may have happened during the struggle between her and Cole because she claims that she acted in fear that Cole was going to hurt her or her children. She urges that the jury should have been able to consider whether her stabbing of Cole was reckless rather than knowing and intentional, and the trial court's refusal to instruct the jury on reckless homicide was reversible error.

[19] The only element distinguishing murder and reckless homicide is the defendant's state of mind: reckless homicide occurs when the defendant "recklessly" kills another human being, and murder occurs when the killing is done "knowingly" or "intentionally." *Compare* Ind. Code § 35-42-1-5, *with* I.C. § 35-42-1-1(1). "A person engages in conduct 'recklessly' if he engages in the conduct in plain, conscious, and unjustifiable disregard of harm that might result and the disregard involves a substantial deviation from acceptable standards of conduct." I.C. § 35-41-2-2(c). Conversely, "[a] person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he or she is doing so." I.C. § 35-41-2-2(b). "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." I.C. § 35-41-2-2(a). Reckless homicide is, thus, an inherently included lesser offense of murder. *Webb*, 963 N.E.2d at 1106.

[20] Therefore, the determinative issue in this case is whether there was a serious evidentiary dispute concerning Sanders's state of mind that would justify giving the requested reckless homicide instruction. In determining whether a serious evidentiary dispute exists the trial court "must look at the evidence presented in the case *by both parties.*" *Id*. at 1107 (emphasis in original). Here, the evidence showed that Sanders admitted during her interview with Detective Barnes to stabbing Cole. Cole was stabbed multiple times, including one wound to the heart. This wound penetrated Cole's heart from front to back, resulting in massive blood loss to Cole. There was also a stab wound that penetrated Cole's liver and caused internal hemorrhaging. The infliction of multiple stab wounds,

including one that penetrated Cole's heart and another that lacerated his liver, is inconsistent with any theory other than that, when Sanders acted, she was aware of a high probability that her conduct might kill Cole. Sanders's own expert, Dr. Fisher, opined that, "[Sanders] struggled with [Cole] over the knife because she thought he was gonna [sic] kill her children and in that struggle or after that struggle she killed him because she thought he was still serious about killing them." *Tr.* at 615. This testimony supported Sanders's argument that she killed Cole in self-defense because she thought he was going to harm the children, but did not show a dispute regarding the level of Sanders's state of mind required for the commission of the offense.

[21] Additionally, on cross-examination, Sanders admitted that she had told Detective Barnes that she liked knives, and on the night of Cole's death, she had picked up the black knife from the kitchen counter and put it in her pocket. *Id*. at 523-24. Sanders also admitted on cross-examination that she told Detective Barnes that, on the night of the stabbing, Cole was making her mad, and she had a knife, so she stabbed him. *Id*. at 530. The evidence also showed that, on January 8, 2013, less than a day before she killed Cole, Sanders wrote in her journal that she "wanted him dead" and that she "would have stabbed" him if Hampton had not been there. *State's Ex*. 124; *Tr*. at 426.

[22] Sanders testified that she did not remember stabbing Cole. *Tr*. at 503-04. She stated that he grabbed a knife and said something about the "mother f*cking kids" that she understood to mean that he intended to harm the children so she cut off his path and told him to give her the knife, which he refused to do. *Id*. at

501-03. Sanders testified that the next thing she remembered was Burks telling her to get the children and then leaving the residence. *Id.* at 504. She did not offer any evidence that she acted in plain, conscious, and unjustifiable disregard of harm that might result when she stabbed Cole and killed him.

[23] The trial court heard the arguments presented by both the State and Sanders regarding giving the reckless homicide instruction and concluded that there was no serious evidentiary dispute as to the facts of the case, stating, "The victim had one stab wound directly to the heart, penetrated all the way through. . . . I don't find this to be a reckless fact pattern such that a lesser included offense is warranted." *Id.* at 817. The trial court reviewed the evidence presented by both parties and determined that a reckless homicide instruction should not be given. We agree. The evidence did not demonstrate a serious evidentiary dispute that would support Sanders's request for a reckless homicide instruction. The trial court did not abuse its discretion when it denied Sander's request.

[24] Affirmed.

[25] Mathias, J., and Brown, J., concur.